Well, if I put my bifocals on, as I should be, then I would read the page correctly. Mayor. Mr. Chief Judge, and may it please the Court, my name is Jeff Doretti, and I represent Husky International Electronics in this case. We got here as a result of an adversary proceeding in bankruptcy court where the judge said because fraudulent representation, there could be no veil piercing under Texas Business Organizations Code 21.223. And he said in the same sentence, because there was no showing of a fraudulent misrepresentation to justify veil piercing, then there could be no fraud as an exception to discharge under Section 523A2A. That was in 2011. While our appeal was pending to the district court, Judge Harmon, the Chief Judge wrote his opinion in Spring Street Partners 4, which added some clarity to the issue of actual fraud under the Uniform Fraudulent Transfers Act. That case had not been, that opinion had not been issued at the time that I wrote the appeal in the district court, but Judge Harmon found it, noted it, followed it, and concluded that a fraudulent transfer is an actual fraud for purposes of Texas Business Organizations Code 21.223. But she then echoed the bankruptcy court in saying that still there could be no exception to discharge under 523A2A because there was no representation. And she cited the United States Supreme Court decision in Field v. Mott. So the issue we bring to the court in this case today is, is a fraudulent transfer an actual fraud under Section 523A2A? The Sixth Circuit has answered this question, yes, in the case of Vitanovich, cited in my brief. The Seventh Circuit has answered this question, yes, in the McClellan case, cited in my brief. The Tenth Circuit has answered this question, yes, in the Diamond case, cited in my brief. That was only two years ago, in 2013. In this case, the Fifth Circuit will decide whether to join the Sixth, Seventh, and Tenth Circuits or whether it will reach a result that will allow corporate debtors to escape liability by fraudulently transferring corporate assets to the corporate owners. That's what happened here. And we submit that in this case it is time for the Fifth Circuit to make it clear that that is not what the bankruptcy code allows. Now, if I could, I want to just look at an issue of statutory construction. I don't know if you have Section 523A2A in front of you. It is actually set out in page 14 of the Applease brief, if you just want to glance at it, because I want to make this point. Section 523, exceptions to discharge. A, a discharge under Section 727 does not discharge a debtor from any debt for money, property, services, or an extension, renewal, or financing of credit to the extent obtained by, and here's the point that I want to make, false pretenses, a false representation, or actual fraud. If we read actual fraud to be nothing different than a false representation, which is what bankruptcy court did and what the district court did, and also what the bankruptcy court and district courts in McClellan did before being reversed by the Seventh Circuit, if we read those terms as being the same, then we are construing Section 523A2A as containing words that have no meaning. The words or actual fraud then are necessarily merely surpluses. The correct construction of this statute must be that the words or actual fraud mean something different from false representations. Now let me address the question of whether there was a fraudulent transfer in this case. Mr. Ritz says no, it was not a fraudulent transfer, there were loan repayments. The bankruptcy court soundly rejected that argument and said yes, there was a fraudulent transfer. The district court rejected this argument and said yes, there was a fraudulent transfer. In fact, district court cites this court's case in N. Ray Swor, S-W-O-R, cited in my brief, in saying it agrees that loan agreements, alleged loans, and in this case there were literally hundreds, alleged loan agreements that are not in writing, that have no repayment terms, that provide no interest rate, and don't really exist at all and didn't exist until after this litigation was commenced are not loans. These are unwise capital contributions and when you draw them out, you are committing a fraud and that's what happened here. Nobody would have ever imagined that these were loans and in fact the argument was never made until we sued for fraudulent transfer. The bankruptcy code addresses fraudulent transfers. It does. Why are you not in that pew? You mean why didn't I make the allegation under the bankruptcy code? I don't know no good reason I did it this way. Isn't that where you should have been, I mean? What am I missing? I mean, it could be argued that I should have been there and if I knew today what I knew 8 years ago what I know today, I probably would have pled both, but the fact that I didn't allege it under the bankruptcy code doesn't mean that the state law ceases to exist. The fraudulent transfer provision, it says the court shall grant the debtor a discharge unless the debtor was content to hinder, delay, or defraud a creditor, has transferred property of the debtor. Doesn't that fit? I'm not saying it doesn't fit. It absolutely fits. Well, the problem with it fitting is that it kind of cuts against your argument about where we should read these other provisions that you want us to read to cover you. I mean, there's a specific provision that deals with it. I'm not trying to give you trouble. I just don't understand exactly how come we are worried about these problems you present when we have a provision in the code that looks like it's targeted right into what happened. Well, I don't have a good answer for that, I suppose, Your Honor. If the court needs me to brief on that, if the court has a concern that it cannot grant relief under the statute, then as pled and tried, then I will try to brief on that. The question has not come up before. I keep thinking I must be on some other planet. I didn't get it, maybe. Well, I seriously doubt that. I have visited several planets in the eight years of this case, and I frequently felt the same way. I'm sorry to leave you in confusion on that. So your position is that while 727A2A would provide relief to your client, this provision also provides relief if a fraudulent transfer is an actual fraud. That is our position, yes. And I think that the law, to me, after having studied it at some length in the context of this case, to me it is very clear that fraudulent transfer is an actual fraud for purposes of Section 523A. Is your position that every fraudulent transfer is an actual fraud, or is your position that the bankruptcy court here made findings such to support an actual fraud determination here? There can be constructive fraudulent transfers, and that is the distinction of the Section 523A, because that is the importance of the word actual in that statutory provision because it contradistinguishes constructive frauds. There can be constructive frauds that are a transfer without reasonably equivalent value, but not accompanied by a wrongful intent to hinder or delay a collection of a debt. But you don't believe it requires a misrepresentation, and that's right. You believe it's a separate fraudulent misrepresentation is a separate one, and so you can show fraud without a misrepresentation, is that right? That is absolutely correct, yes. I think the statute says it, and the Sixth, Seventh, and Tenth Circuits have said it, yes. What is the evidence of actual fraud, and what findings were made here about actual fraud in this record? In this record, there are badges of fraud. I think I pointed out four in the brief. This is the way fraudulent intent, and that's the distinction between constructive fraud and actual fraud. It's a question of intent. Constructive fraud is irrespective of any bad intent, but an actual fraud is a bad mind, an intent to stop or pender or delay a collection. So since we never have a window into the mind of another human being, the Uniform Frauds and Transfers Act provides for a list of, I think it's 11 or 12, non-exclusive badges of fraud that a court can use to infer the intent of the actor. Judge Bohm lists two of them in his opinion. As I point out in the brief, at least two others are also extant in the evidence at trial and are in the record, and I could argue that there are four or five. There is no magic number. One of the ones I did not argue is that the debtor remains in control of the assets. If you recall the evidence in the record here, Mr. Ritz was transferring $1.1 million and hundreds of transfers to eight corporations that he owned or controlled. I would argue that that is him remaining in control of the assets after the transfer. I did not argue that one, but there is at least that one additional badge of fraud. But that is how we get to an inference of actual fraud as distinguished from constructive fraud. So what would we hold exactly, that Ritz's debt is accepted from discharge because of 523A2A, because this fraudulent transfer constituted actual fraud? Is that the holding that you seek? Yes, Your Honor, that would be it. Is relief under 523A6, that's alternative relief? That's correct. Do you have a finding in this record that would support relief under 523A6, or would we have to remand if we were going to rule on 523A6? I don't think the court would need to remand on it. This is my analysis, and I have not yet convinced a court that I'm right on this. There's a lot of overlap between a malicious, willful malicious act and an actual fraud, and those are often pled and found together occasionally. I think the McClellan v. Cantrell case may actually talk about a distinction between 523A6 and 523A2A. To me, they overlap, but sometimes a willful and malicious act that falls short of an actual fraud may also be a basis to accept the debt from discharge, and that's why I pled and argued it that way. But we don't need to reach that issue if we decide the prior issue in your favor. I will take a victory on either ground, Your Honor. But I'm not foreshadowing. I'm just in the hypothetical. Of course not. Of course not. Judge Alrod, I've known you for some time. But no, you do not need to reach that if we win on the first issue. If the court has no further questions, I'm happy to cede back my remaining 44 seconds. All right. Sir, you have reserved time for rebuttal. I have reserved five minutes. You can have it. All right. Mr. Weber. May it please the court, I'm Bill Weber. I represent Daniel Ritz, Chief Judge Stewart, Judge King, Judge Alrod. I want to start talking about the facts of this case because Husky would lead this court to believe that the facts in this case are undisputed. They are disputed. And, in fact, I think they paint a completely different picture than Husky portrays. Were there transfers? Yes. There were numerous transfers. And they were constantly coming in and out. They were bank wire transfers coming in and out. And they were intended to finance the business operations of the company. This happened over one and a half years. But the fact that I want the court to look at are several, but this is a big one. $2.8 million went in from these entities. There were six entities that made the transfers. These were entities that Mr. Ritz controlled. He owned stock in some. He managed others. But he was essentially in control of them. He moved $2.8 million from these other companies into Chrysalis, which is the company to which Husky's parts were sold. $1.8 million were moved out. These transfers were made essentially over a period of time. This is not a situation where all the transfers were made, the money coming in were made at the beginning and the transfers out were made at the end. They were coming in and out, in and out. Now, we'll admit those documents were or those loans were not documented correctly. They should have been properly documented. But there was testimony at trial from Ms. Finney that these were intended as loans. So as part of the analysis, Husky is claiming that you can't count any of the money going in, but you can count the money going out as a fraudulent conveyance. Now, I'm not really sure. He may well be right. There's really two types of fraudulent conveyances. There's fraudulent conveyances in which the transfer is not made for a reasonably equivalent consideration. That's what the judge in this case found. There are other kinds of transfers where they're made with an intent to hinder or delay the creditor from collecting his debt. Judge Baum did not find that in this case. But didn't he have a long time period? Didn't he look at when Husky sold to Chrysalis rather than when Ritz transferred all of its money out of Chrysalis? Yes, Your Honor, but it's the same. I mean, the transfers were coming in and out at all times virtually for about a year and a half, and they were equally coming in and out over the time period that Husky sold the parts and even afterwards. So when Ritz transferred all of its money out of Chrysalis, it later transferred all of its money back into Chrysalis? No. What these transfers were, and I want the Court to look at the record excerpts that I provided because these document every single transfer that went in and out over at least the one-and-a-half-year time period. And you'll see that there's wire transfers coming in, then there's wire transfers repaying that loan, coming out. They're coming in, coming out, coming in, coming out. It shouldn't have been done that way. And perhaps they don't count for purposes of determining whether it's reasonably equivalent value. But they certainly do count when you look at whether there was intent because intent is the prime factor in this case. Did Mr. Ritz intend to hinder or delay these creditors? I think the answer is no. I'm really confused. Did Mr. Ritz drain the insolvent Chrysalis of its remaining funds or not? I'm having a hard time. Did Mr. Ritz drain the insolvent Chrysalis of its remaining funds? The answer, I think, to that, Your Honor, is no. And here's why. Your Honor, let me tell you why all this was done. There was a merger plan going on here. This is why this business was bought as a turnaround. It was in bad shape from day one, and Mr. Ritz bought this company to attempt to turn it around. There was a merger plan formed sometime before September of 2006, and the plan was to merge three of these entities, ComCon, which was created for the purpose of being the merger recipient, Dynalist, and Chrysalis. They were going to merge that into ComCon. And there was a public entity called Virtua Systems, Inc., who was the proposed merger partner to roll up all those assets into Virtua Systems. So that was what was going on. That failed. That merger plan failed in February of 2007. After that, the plan was let's keep this company going. Let's keep it a viable entity so we can sell these assets. And then in May of 2007, the manufacturing stopped. All of the sales occurred between November of 2007. The Husky sales occurred between November of 2007 and January of—I'm sorry, November of 2006 and January of 2007. But the Husky sales are not what's at issue. What's at issue is the transfer of the $163,000 after it was already going down, not this time of the sales. But, Your Honor, there was also money going in. At the time the $163,000 was taken out? All the way up to May of 2007, there were massive amounts of money going in. If you take a look at—I think it's Exhibit 25. That shows that ComCon was basically financing the payroll. So, Your Honor, during all of this time between January of 2006 and May of 2007, there were business operations going on. They were manufacturing product at their California plant. They had numerous employees that they were paying through ComCon. They were buying and selling inventory. Some of that was made from Dinalys. I think one critical fact I want the Court to consider is this guarantee that Mr. Ritz signed. All the sales were completed to Husky in January of 2007. After that, Mr. Ritz guaranteed a $133,000 debt owed to Arrow Electric. That was done so that he could keep the business going, so that he could induce them to sell additional product, so he could keep the business viable, so that he could, even after the merger plan failed, so that he could sell the assets or the stock of the company to a buyer. Please also consider the deposits in the bank accounts. This is not a situation where money was going out, there was no business going on, there was no money being generated, that there was no viable business. This company, between January 2006 and May of 2007, earned $9.5 million. If you look at between November of 2006, which is when the sales at issue, the Husky sales started, and May of 2007, when the company shut its doors, $2.7 million of bank deposits from sales were made into Chrysalis's bank account. If you only count the income that occurred after all the sales were made, that would be February of 2007 through May of 2007, $1.5 million of deposits were made into Chrysalis's bank account. In other words, and that was all from sales of product. Those were not transfers, those were from sales of product. So, I would ask the court to consider these facts as to the intent. What was Mr. Ritz's intent? Because that's critical to both the hinder and delay issue, and the willful and malicious injury issue. The intent of the person is critical on that. This does not present a set of facts of a greedy, desperate person attempting to drain the company of assets. I mean, if you look at the timing and the amount and the quantity of the transfers, I think this paints a picture of a person that was basically attempting to keep this company running, complete the merger plan. When the merger plan failed, he was attempting to keep this a viable, valuable entity to maximize the value. Can you please point me to the record? I would look to see that Ritz was putting money in during the February to May time period, something that's actually in the record, not in these exhibits that you put together post-district court, but something that's actually in the record. What record pages would I want to read for that? Your Honor, I want to correct maybe your misimpression. Those exhibits that I've prepared are in the record. But you made some corrections. They are in evidence. They were exhibits at trial. Okay, but the exhibits as they existed at trial, not as corrected before this court. One of those exhibits was corrected. 59.1, right? Yes, Your Honor. And that was a summary of a summary. All the other exhibits, 25 through, I don't have them with me, 25, the exhibits that do the individual transfers between each of the entities into Corsalis and back, they were all exhibits. What Judge Baum did is he denied admission of the summary of the summary. You're basically, that's what you're looking, you're talking about, the summary of the summary. What would you want me to look at that would prove that the case is like you say it is? I don't want to be argumentative with you. I just want to go back and read what you. I would like you to look at all the record excerpts that were submitted, which were exhibits at trial. And I'd also like you to consider the bank deposits. Throw out the first two months. You are correct that there was a mistake on the first two months. I think it was January and February. And those were corrected in the table put in the brief. But throw those out, because as the court has indicated, perhaps that isn't even relevant. Okay. I'm just trying to figure out where in the record are the things that you called record excerpts. Where can I go to the record to find these documents that you've submitted here? Your Honor, trial exhibits are part of the record. And those record excerpts that you're looking at were trial exhibits. And they were admitted into evidence. So every single one of these was admitted into evidence in the form that you've submitted it here to this court. All of them were. All of them were. Okay. Every one of those was admitted into evidence. In this form, exact form. That exact form. Mr. Durell is correct. The table in the brief was a summary. And that, I think, a similar table was admitted into evidence. But a correction was made by me as to the first two months, because I wanted to be honest with the court. Those two entries were erroneous. But they were corrected. But I think they're not relevant. Assume, arguendo, that there is some evidence in the record of fraudulent transfer. Did you want to address the issue on the merits on whether fraudulent transfer can constitute actual fraud? Absolutely, Your Honor. That is one of the prime issues in the case. It hasn't ever been addressed by the Fifth Circuit. But I would say the first thing the court ought to look at is whether a fraudulent conveyance can comply with the obtained by clause in the statute. This court, over the years, well, let's take a look at the statute first. The statute says you've got to have a debt for money, property, or services obtained by fraud. So the issue is, how do you read that? Does fraud need to occur at the inception of the debt? Or does the money, property, or services need to be procured from the creditor? Mr. Durrell will argue no, it doesn't need to occur at the inception of the debt. And he'll say no, the money, property, or services don't need to be procured from the creditor. I think if any natural reading of the statute, the statute is a little bit vague. We'll acknowledge that. But a natural reading of it would lead you to the conclusion that the property, which in this case are the parts obtained from Husky, must be obtained as a result of fraud. They must be obtained from Husky as a result of fraud. And even, Your Honor, I would ask you to look at the concurring opinion in McClellan. That was a split decision in that case. And Judge Tripple, on this very issue, said, Given the overall structure of Section 523, it seems clear that Congress intended that 523a2a should cover debts relating to the procurement of money or property by fraud. And 523a6, that's malicious and willful intent to injure, should apply in this situation. The language obtained by, in quotes, clearly indicates that the fraudulent conduct occurred at the inception of the debt. The debtor committed a fraudulent act to induce the creditor to part with his or her money, or his money or property. That's not what happened in this case. We all acknowledge, I think everybody knows, Mr. Ritz never even talked to anyone at Husky until after all the sales were made. He knew that they were a supplier, but he didn't even know the sales were going on. So, there was no representation, there was no reliance, and there was no, on this particular issue, there was no property obtained as a result of fraud. And I would argue on that very issue that this statute ought to be read to require that Husky sold parts on the account of, and it was induced to do so by fraud. If actual fraud requires a misrepresentation, then why did Congress add it to the statute in 1978 when the statute already accepted from discharge any debt for money or property obtained by false representation? Doesn't your, the legislative, the history, the legislative history contradict your argument? No, Your Honor. I think the obtained by language was added later. In 1978, the bankruptcy code always said false pretenses, false representations, or actual fraud. And there's always been this question as to whether the elements are the same or whether they overlap or whether they're different, which I frankly don't think that's really, that's not even an issue in this particular case. Assuming, arguendo, that in fact Congress did add the terms actual fraud to the statute in 1978, how does that affect your argument? I'm sorry, Your Honor, I didn't, I'm hard of hearing. I'm sorry, sir. Assuming, arguendo, that Congress added the term actual fraud to the statute in 1978, I know you said you don't think it did. No, no. Maybe I misstated that. Yes, they added that to the bankruptcy code in 1978, but there was no change after that. But if they added the term actual fraud where false representation already was in the code, then doesn't that tell you that actual fraud is something different than false representation? I think perhaps, Your Honor, it is. I'm not really prepared to talk about what a false, what the other, what a false pretenses are or false representations. All I know is that this particular court has basically defined actual fraud over the last 20 years the same way. It's defined actual fraud as a debt. I'm sorry, it is defined actual fraud as requiring a representation. It needs to be false. It needs to have intent to deceive, which the court didn't find in this case. The court didn't find any reliance. There's got to be causation. There's got to be damage. Recoverage sets forth those elements. Mercer in 01 sets forth those elements. Acosta, this court, in 05, set forth those identical elements. And in 2012, all the decisions were unpublished that I could find on that, but they also set forth the same elements. One is Cardwell, 47 Federal Appendix 183. The court has consistently held that a representation is required ever since the bankruptcy code was enacted. So I would argue that that's binding authority. Okay. Assuming, arguendo, that there is not binding authority to the contrary and that this is instead an issue of first impression, would we be running afoul of the other circuits if we were to hold as you would have us to hold given the 7th, the 6th, and the 10th? Yes, Your Honor. I do. I think you would be. I think that there's some things that I disagree with in the district court analysis. One thing is in the district court found that Ritz used Chrysalis to perpetrate a fraud on his creditors. She actually found that Judge Baum found that. Judge Baum didn't find that. Judge Baum did indeed find that the transfers were made with a lack of reasonably equivalent value. He did make that finding. That is one type of fraudulent transfer. But as Mr. Durrell pointed out, there's two kinds of fraudulent conveyances. There's actual fraud conveyances and there's constructive fraud. Even under his case, even under McClellan, the fraud that we're talking about in this particular case would be construed as constructive fraud. It wouldn't come in within the ambit of that case. But I think the district court judge did get it right when she relied on field versus man. This court has relied on field versus man itself. In Mercer, it made the same field versus man analysis when this court held that the court held that constructive, you cannot infer fraudulent intent based solely on hopeless insolvency. Go ahead. The court looked to the restatement of torts, which field versus man requires, and you look at the restatement of torts, which talks about false representations. It sets forth the elements. First of all, fraudulent conveyance is nowhere mentioned there. And so, therefore, that was the basis of the district court's conclusion that you have to have a false representation. My last question has to do with would we have to – you went through how you said the evidence in the record supports that money was coming in as well as going out and that we should go to the record. Would we have to find the finding that transfers were made without receiving reasonably equivalent value? Would we have to find that was clearly erroneous in order to see the world as you see it? I don't think so, Your Honor. Because, again, even if the court decides to adopt McClellan and even if the court determines that a fraudulent conveyance can be actual fraud under 523A2, my argument is that that case itself supports my position. It says the constructive fraud, which that's all reasonably equivalent value deals with, that would be a constructive fraud. A blameless, clueless person can do that without zionter. That would not constitute actual fraud. You could leave that finding undisturbed, but I think not only did the court below not find it, but the evidence overwhelmingly supports the view that Mr. Ritz was attempting to save this business. He had no intent to hinder or delay. He was trying— All right, Mr. Brewer, I'm going to let you complete your answer to Judge Elroy but not shift to another lawyer. Thank you, Your Honor. Good. All right. The battle with Mr. Durant. Well, let me try to speak to at least two points while I answer the court's questions. Mr. Ritz seems to think that he is retrying the case in the Fifth Circuit. He wants you to look at his tables and his charts, and some of which were admitted into evidence and some were not, and you were supposed to perform a mathematical calculation to figure out whether more money came out than went in. Here's the problem with that. One is it depends on what window of time you look at, because as you slide the window around, you get a different result, and in the window immediately preceding the bankruptcy filing is when the $1.1 million came out. Judge Bohm— Did anything go in in that window? I don't know the answer to that as I stand here. It's probably material. No, and here's why. This court reviews the fact finding of Judge Bohm for clear error. Judge Alrod keyed in on that when she said, don't we have to find that it was clearly erroneous when Judge Bohm concluded that the money sucked out of Chrysalis was not in exchange for reasonably equivalent value, and that is exactly right. This court has to review the bankruptcy judge's findings of fact for clear error. Judge Bohm goes on for about two pages in his opinion. All of the arguments that Mr. Weber makes and that his client testified to in the bankruptcy court were made before. Judge Bohm concluded that Mr. Ritz was not a credible witness. He is the fact finder on credibility of testimony, and Judge Bohm, based on the incredibility of Mr. Ritz's testimony and evidence, concluded that these transfers were made with the intent of defrauding my client and other creditors. So I don't think there has been a showing of clear error. It's a pretty high bar to get to, but Mr. Weber seems to approach it as though this is de novo review on those fact findings, and I think he's mistaken about that. The other issue I want to address is the obtained by clause in the statute. The McClellan case gives a pretty interesting discussion, and you've probably all read it. The distinction it draws, which is pretty important, is that the debt that is being accepted from discharge, if the court goes with my argument on this, is not the purchase of electronic components for $163,000. The debt is a new debt, and the inception of the new debt was when Mr. Ritz ordered the transfer of $1.1 million of Chrysalis money to other companies that he owned and controlled and made Chrysalis unable to pay. That is two different things. McClellan talks about that pretty clearly and gives some examples. So I think it is incorrect to say that there must be a fraud in the purchase of the electronic components from Husky by Chrysalis. I don't think any court has agreed with that so far. That argument has been made before, and I think it is an incorrect argument in this court today. Mr. Weber mentions the restatement and how the restatement of torts does not talk about fraudulent transfer. That is, of course, correct. The restatement is a restatement of common law principles. The Uniform Fraudulent Transfers Act is a statute, so obviously uniform fraudulent transfer torts would not be found in the restatement. This is something different. This is not a creature of the common law from 300 years of jurisprudence. It is a statute that says you can't transfer your assets and money away in order to prevent your creditors from being able to collect their debts. I don't think I have anything else. Happy to answer a question. You hit the pause point as the zeros came up, so great timing. Thank you for your briefing and argument. Thank you, Mr. Weber, for yours. It's an interesting case to say the least. It will be submitted. We'll decide. Thank you, Judge. Thank you.